**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

THE WILD ANIMAL SANCTUARY, A COLORADO NON-PROFIT CORPORATION,

    Plaintiff,

v.

BLACK & VEATCH CORPORATION, and
BRINKERHOFF FOUNDATION DRILLING, INC.,

    Defendants.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff The Wild Animal Sanctuary, a Colorado Non-Profit Corporation (the "Sanctuary"), by and through its undersigned counsel, for its Complaint against Defendants Black & Veatch Corporation ("Black & Veatch") and Brinkerhoff Foundation Drilling, Inc. ("Foundation Drilling") alleges as follows:

**NATURE OF THE ACTION**

1. The Sanctuary is a small non-profit organization that serves an important mission: to rescue and provide a wonderful life to large carnivorous animals who have been abused, abandoned, or illegally kept. More than 150,000 people visit the Sanctuary every year to experience first-hand the rescued tigers, wolves, lions, and other animals that roam freely on the Sanctuary's grounds. The Sanctuary is primarily an all-volunteer organization and relies on small donations made by everyday people who care about the welfare of these animals to continue its operations.

2. In August 2019, the Sanctuary purchased a 2001 Texoma 900T drilling rig (the "Drilling Rig") from Black & Veatch in a sale brokered by Foundation Drilling. The Sanctuary paid $165,000—with borrowed funds—for the Drilling Rig because Defendants represented that it could drill to a depth of 80 feet, was "Ready to Run, Drive, and Drill," and was in "Good" condition and "Well Maintained."

3. Despite Defendants' representations, the Drilling Rig has been defective and useless to the Sanctuary from the moment the Sanctuary received it. It cannot drill even 7 feet into the ground, let alone the 80 feet Defendants promised.

4. The Sanctuary has attempted to work with Defendants to solve the problems with the Drilling Rig, but they have refused. Months after the Sanctuary told Defendants the Drilling Rig did not work, Defendants finally sent a technician to diagnose the Drilling Rig's defects. The technician confirmed that the unit's transmission did not function, but stated that he was unable to repair it at that time. Defendants have subsequently confirmed that they will not fix the Drilling Rig to make it function as represented.

5. The Sanctuary now seeks the Court's assistance in remedying Defendants' fraudulent representations and compelling Defendants to make the Sanctuary whole.

## JURISDICTION AND VENUE

6. The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a). The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7. This Court has personal jurisdiction over Defendants under Colorado's long-arm statute because they conducted business transactions and committed tortious acts in Colorado.

*See* Colo. Rev. Stat. Ann. § 13-1-124(1)(a)-(b). This exercise of personal jurisdiction comports with due process because Defendants purposefully availed themselves of this forum by making fraudulent statements and selling a defective good to the Sanctuary, which they knew to be located in Colorado.

8. Venue is appropriate in this district under 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to the claim occurred in this district.

## PARTIES

9. The Sanctuary is a non-profit corporation organized and existing under the laws of the State of Colorado with its principal place of business in Keenesburg, Colorado.

10. On information and belief, Black & Veatch is an international engineering, procurement, consulting, and construction corporation organized under the laws of the State of Delaware and with its principal place of business in Overland Park, Kansas.

11. On information and belief, Foundation Drilling is a broker of construction equipment organized and existing under the laws of the State of Texas and with its principal place of business in Spring Branch, Texas.

## DEFENDANTS' SALE OF THE DEFECTIVE DRILLING RIG TO THE SANCTUARY

12. Along with its Keenesburg, Colorado headquarters, which is comprised of 789 acres of open grassland and serves as a public educational facility and site hosting over 520 rescued animals, the Sanctuary also operates a 9,864-acre wildlife refuge located near Springfield, Colorado. The Springfield refuge was acquired in early 2018 so the Sanctuary could continue to expand and promote its mission of serving rescued animals.

13.     In or about August 2019, the Sanctuary determined that in order to develop the Springfield refuge it would need to acquire a commercial drilling rig that would be able to drill post holes up to 20 inches wide and 7 feet deep.  After thorough research, the Sanctuary's executive director Patrick Craig determined that the Texoma 900T drilling rig would be best suited for the Sanctuary's needs.  Mr. Craig made this determination because he learned Texoma drilling units are used exclusively in the foundation and caisson drilling industry and the 900T model was the largest Texoma drilling rig he found.

14.     Because his research showed that Texoma 900T drilling rigs were designed to drill much larger and deeper foundation holes than the Sanctuary would need, Mr. Craig was confident that such a drilling rig would be suitable for any work needed at the Springfield refuge. He therefore searched for Texoma 900T units for sale and learned that Foundation Drilling was advertising the Drilling Rig for sale.

15.     On or about August 17, 2019, Mr. Craig emailed Foundation Drilling representative Daniel Parker to ask if the Drilling Rig was still available for purchase.

16.     Mr. Parker responded that the unit was available and provided the Drilling Rig's "Equipment Listing Information."

17.     The Equipment Listing Information contained several material misrepresentations regarding the qualities of the Drilling Rig:

- It represented the Drilling Rig had a "Max Depth" of "80ft."

- It further represented that the Drilling Rig's "General Condition" was "Well Maintained."

- It represented the Drilling Rig "Unit is Ready to Run, Drive & Drill."

- It represented that the Drilling Rig's "Condition" was "Good."

A copy of Mr. Parker's email containing the Equipment Listing Information is attached as **Exhibit A**.

18. On information and belief, Foundation Drilling received the information in its Equipment Listing Information from Black and Veatch.

19. In reliance on the Equipment Listing Information, the Sanctuary agreed to enter into a purchase agreement (the "Purchase Agreement") by which it would acquire the Drilling Rig from Black & Veatch. The Purchase Agreement stated that the Sanctuary would pay $165,000 to Black & Veatch for the Drilling Rig. A copy of the Purchase Agreement is attached as **Exhibit B**.

20. The Purchase Agreement listed the Sanctuary's complete Keenesburg, Colorado address. It was signed by Mr. Craig for the Sanctuary on or about August 19, 2019, and by Larry Reeves, a Construction Equipment and Fleet Service Program Manager for Black & Veatch, on or about August 21, 2019.

21. On or about August 20, 2019, Black & Veatch issued a sale invoice (the "Sale Invoice") to the Sanctuary at its Keenesburg, Colorado address that was again signed by Mr. Reeves for Black & Veatch. The Sale Invoice stated that the Sanctuary would pay Black & Veatch $165,000 for the Drilling Rig, plus sales tax, by August 30, 2019.

22. The Purchase Agreement and the Sale Invoice both included boilerplate "as is" clauses. The Purchase Agreement stated that the Drilling Rig "is sold in an 'as is' condition with no warranties expressed or implied." The Sale Invoice summarily stated that the Drilling Rig was "[s]old as is, where is."

23. Neither the Purchase Agreement nor the Sale Invoice suggested that the Sanctuary was disclaiming reliance on the information provided in the Equipment Listing Information. Nor did either document contain any reference to the false assertions made in the Equipment Listing Information.

24. Because the Sanctuary could not afford the purchase of this Drilling Rig, it engaged Ritchie Bros. Financial Services to finance the purchase.

25. On or about August 27, 2019, Foundation Drilling sent a revised invoice to the Sanctuary and Ritchie Bros. Financial Services, removing the sales tax from the Sale Invoice because the Sanctuary is a non-profit organization.

26. The Sanctuary subsequently paid Black & Veatch the purchase price for the Drilling Rig through the loan it received from Ritchie Bros. Financial Services. On information and belief, Black & Veatch paid Foundation Drilling for its services in finding the Sanctuary to buy the Drilling Rig.

## THE DRILLING RIG FAILS TO PERFORM AS DEFENDANTS PROMISED

27. On or about September 5, 2019, the Sanctuary paid a delivery company $11,900 to transport the Drilling Rig to the Sanctuary's Springfield, Colorado location. The Drilling Rig arrived on or about September 10, 2019.

28. Upon receiving the Drilling Rig, the Sanctuary learned almost immediately that the representations made about the Drilling Rig's qualities were false.

29. On or about September 11, 2019, Mr. Craig wrote to Mr. Parker that the transmission shift select interface and associated cables were not in the Drilling Rig and were

just handed to the Sanctuary in a clump.  He further noted that the high/low speed on the Drilling Rig's tracks did not function.

30. Mr. Parker responded that "[t]hese guys [Black & Veatch] assured me they had gone through this," and "I will make them aware these types of issues need to be noted."

31. On or about September 12, 2019, during the very first full day of drilling, the Sanctuary found that the Drilling Rig could not drill even 7 feet into the ground.

32. Mr. Craig immediately emailed Mr. Parker to tell him that the Sanctuary received a defective unit.  Mr. Craig wrote that it was inconceivable that Black & Veatch could not have known the Drilling Rig would not perform as promised.

33. Mr. Parker responded to Mr. Craig by telling him that Foundation Drilling would try to rectify the Drilling Rig's defects.  But after a month of the Sanctuary patiently waiting, neither Black & Veatch nor Foundation Drilling had done anything to repair or replace the Drilling Rig.

34. On or about October 12, 2019, Mr. Craig again reached out to Mr. Parker.  Mr. Craig reminded Mr. Parker that the Sanctuary was a small non-profit organization and could not afford to be left $165,000 in debt for a drilling rig that did not work.  He again asked for Foundation Drilling and Black & Veatch to remedy the problems.  Mr. Parker responded by again assuring Mr. Craig that Foundation Drilling would see that the Sanctuary received help.

35. On or about October 22, 2019, Mr. Craig reiterated to Mr. Parker that the Sanctuary was still unable to use the Drilling Rig.

36. On or about November 4, 2019, Mr. Parker finally told Mr. Craig that Black & Veatch was willing to send a technician from EmWest Powertrain Systems ("EmWest") to

examine the Drilling Rig. But even then, Mr. Parker said that Black & Veatch would do so only if the Sanctuary agreed to release it from any further expenses related to repairing the Drilling Rig. Mr. Craig responded that the Sanctuary would release Black & Veatch only after the technician had fully repaired the deficiencies with the Drilling Rig.

37. Nevertheless, on or about November 19, 2019, the EmWest technician arrived at the Sanctuary and inspected the Drilling Rig. The EmWest technician examined the Drilling Rig and noted that the breather, a critical component allowing for proper airflow, was missing from the transmission. The Sanctuary's representative, Casey Craig, told the technician that when oil was added to the Drilling Rig, it came out "milky." The EmWest technician identified this issue as consistent with water contamination, likely due to the Drilling Rig's missing breather.

38. The EmWest technician then performed a converter stall test by increasing the Drilling Rig's engine speed to maximum. He stated, however, that because the Drilling Rig's tachometer was non-functional, the stall test was generally ineffective. The EmWest technician also reduced the Drilling Rig's engine speed to idle and checked its pressure gauge, which he found was also non-functional.

39. On or about November 26, 2019, the EmWest technician sent to Mr. Craig and Mr. Reeves a document titled "Troubleshoot Report" describing the defects in the Drilling Rig. In his cover email attaching the report, the technician wrote that water had been allowed to contaminate the transmission of the Drilling Rig and the resulting water damage would eventually lead to a catastrophic transmission failure. He gave his recommendation that the Drilling Rig's transmission should be rebuilt. In the Troubleshoot Report, the EmWest technician confirmed that the Drilling Rig's transmission required rebuilding.

40. On or about December 9, 2019, Mr. Parker wrote to Mr. Craig that Black & Veatch had paid EmWest's $2,533.32 fee to examine the Drilling Rig and that this was the final expense Black & Veatch intended to incur regarding repairing Drilling Rig.

41. On or about February 20, 2020, the Sanctuary's attorneys sent letters to Foundation Drilling and Black & Veatch asking Defendants to work with the Sanctuary to resolve the issues with the Drilling Rig. Foundation Drilling simply responded that it would pass along the Sanctuary's letter to Black & Veatch. Black & Veatch ignored the Sanctuary's letter.

## COUNT I: FRAUD
(Against Black & Veatch)

42. The Sanctuary realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 41 as though fully set forth herein.

43. Black & Veatch misrepresented the condition of the Drilling Rig to the Sanctuary in the Equipment Listing Information.

44. Specifically, the Equipment Listing Information misrepresented that the Drilling Rig had a "Maximum Depth" of "80 ft" and was "Ready to Run, Drive, & Drill," "Well Maintained," and in "Good" condition.

45. Each of these false representations was material and made with the intention of motivating the Sanctuary to purchase the Drilling Rig.

46. The Sanctuary justifiably relied upon these misrepresentations in purchasing the Drilling Rig and did not know they were false.

47. The Sanctuary was actually damaged by Black & Veatch's fraudulent misrepresentations.

## COUNT II: FRAUDULENT CONCEALMENT
(Against Black & Veatch)

48. The Sanctuary realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 47 as though fully set forth herein.

49. The Drilling Rig has been defective from the moment the Sanctuary received it and has never worked properly.

50. Despite this, Black & Veatch disclosed no defects with the Drilling Rig and affirmatively represented that the Drilling Rig had a "Maximum Depth" of "80 ft" and was "Ready to Run, Drive, & Drill," "Well Maintained," and in "Good" condition.

51. On information and belief, Black & Veatch knew that the Drilling Rig was defective.

52. Black & Veatch had a duty to disclose information that contradicted its misleading and incomplete declarations in the Equipment Listing Information. Colorado law "impose[s] an obligation that known material but hidden defects be fully disclosed" by a seller of goods. Colo. Rev. Stat. § 4-2-314, cmt. 3.

53. On information and belief, Black & Veatch intentionally concealed the Drilling Rig's defects in order to motivate the Sanctuary to purchase it.

54. The Sanctuary did not know of the defects with the Drilling Rig at the time it agreed to purchase the unit.

55. The Sanctuary was actually damaged by Black & Veatch's concealment of the Drilling Rig's defects.

## COUNT III:
## NEGLIGENT MISREPRESENTATION
(Against All Defendants)

56.     The Sanctuary realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 55 as though fully set forth herein.

57.     Defendants intentionally or negligently misrepresented to the Sanctuary that the Drilling Rig had a "Maximum Depth" of "80 ft" and was "Ready to Run, Drive, & Drill," "Well Maintained," and in "Good" condition.

58.     On information and belief, Defendants made these misrepresentations in order to induce the Sanctuary to purchase the Drilling Rig.

59.     The Sanctuary reasonably and justifiably relied upon these negligent misrepresentations in deciding to purchase the Drilling Rig.

60.     The Sanctuary was actually damaged by Defendants' negligent misrepresentations.

## PRAYER FOR RELIEF

WHEREFORE, the Sanctuary respectfully requests that this Court:

a)  Award the Sanctuary damages on its Complaint against Defendants and its costs and expenses of this action;

b)  Grant such other and further relief to the Sanctuary as the Court deems just and appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

The Sanctuary demands a jury trial on all issues so triable.

DATED: May 13, 2020

SHERMAN & HOWARD LLC

*s/Nicholas M. DeWeese*
Nicholas M. DeWeese
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Telephone: (303) 298-8220
Facsimile: (303) 298-0940
Email: ndeweese@shermanhoward.com

O'MELVENY & MYERS LLP
Abby F. Rudzin
Charles J. Mahoney
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
Email: arudzin@omm.com
cmahoney@omm.com

*Attorneys for Plaintiff The Wild Animal Sanctuary, a Colorado Non-Profit Corporation*

Plaintiff's Address:
1946 County Road 53
Keenesburg, CO  80643